## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**THOMAS K. HASSON**,

Plaintiff,

v.

**3M COMPANY**,

Defendant.

Civil Cause:   3:19-cv-2890

**JURY TRIAL DEMANDED**

The Hon. M. Casey Rodgers
MDL No. 2885

## COMPLAINT

**COMES NOW**, Plaintiff, THOMAS K. HASSON, and files this, his Complaint for damages against Defendant, 3M COMPANY, showing this Honorable Court as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Thomas Hasson is an individual residing in Utica, Pennsylvania.

2.      Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business located at 3M Center, Tax Bldg. 224-5N-40, St. Paul, Minnesota 55144.  3M may be served through its registered agent, Corporation Service Company, located at 1201 Hays Street, Tallahassee, FL 32301.

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy is greater than $75,000.00.

4.      3M designed, manufactured, and sold or otherwise placed dual-ended Combat Arms[TM] earplugs into the stream of commerce, including transactions with and distribution to United States Military bases and servicemembers located in Florida.  3M knew at all times during the design, manufacture, and sale of the dual-ended Combat Arms[TM] earplugs that the products in question would travel among and through each and every state, including Florida, and 3M should have reasonably anticipated the need to answer suit arising out of the manufacture, design, and sale of said product in Florida. 3M's contacts with the State of Florida are systematic, ongoing, and sufficient to support the proper exercise of personal jurisdiction over 3M.

5.      Additionally, and in the alternative, 3M purposefully availed itself to business dealing in the State of Florida and could reasonably expect to respond to complaints therein.  3M's purposeful availment of the benefits and protections of the laws of Florida is sufficient to support proper exercise of personal jurisdiction over 3M.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

7.      On May 4, 2019, the Judicial Panel on Multidistrict Litigation selected the Northern District of Florida as the transferee district and for this Court to preside over MDL No. 2885 pursuant to 28 U.S.C. § 1407.

8.      Plaintiff would have filed this action in the western district of Pennsylvania in the absence of direct filing in this MDL.

## FACTUAL ALLEGATIONS

9.      Plaintiff Thomas Hasson is an Army combat veteran, having served in active duty from 1987-1991 and as member of the National Guard from 1991-2012. Plaintiff was deployed overseas in Iraq from 2008-2009, during which time he was exposed to weapons discharge and explosions.

10.     While stationed in the United States and overseas in Iraq, Plaintiff was issued dual-ended Combat Arms™ earplugs designed, manufactured, marketed, and sold by 3M.  As a result of using these defective earplugs during combat and training, Plaintiff has suffered and continues to suffer daily from tinnitus, hearing loss, and other damages.

11.     In July 2018, 3M agreed to pay $9.1 million to resolve allegations that it supplied the United States with defective dual-ended Combat Arms™ earplugs.  *See United States of America ex rel. Moldex-Metric, Inc. v. 3M Company*, In the United States District Court for the District of South Carolina, Columbia Division, Case No. 3:16-1533-MBS.  In that case, the United States alleged that 3M, and its predecessor, Aearo Technologies, Inc. ("Aearo"), knew the dual-ended Combat Arms™ earplugs were too short for proper insertion into users' ears and that the earplugs could loosen imperceptibly and therefore did not perform well for certain individuals.  The United States further alleged that 3M did not disclose this design defect to the military.  The petition in that case is attached hereto as Exhibit "**A**" and is incorporated herein by reference.

12.     3M's dual-ended Combat Arms™ earplugs, which are non-linear (selective attenuation) earplugs, were designed to provide soldiers with a single set of earplugs that

offer them two options for hearing attenuation depending on how the plugs are worn.  If worn in the "closed" or "blocked" position, the earplugs are supposed to block sound like traditional earplugs.  If worn in the "open" or "unblocked" position, the earplugs are supposed to block, or at least significantly reduce, loud impulse sounds of battlefield explosions, while still allowing the wearer to hear quieter noises, such as commands spoken by fellow soldiers or approaching enemy combatants.

13.     3M's dual-ended Combat Arms™ earplugs were originally created by Aearo Technologies.  3M acquired Aearo in 2008 for $1.2 billion.  Post-acquisition, the Combat Arms™ earplugs were marketed and sold under the 3M brand and the Aearo employees that developed and tested the defective earplugs became employees of 3M. These 3M employees were aware of the earplugs' defects as early as 2000, several years before 3M/Aearo became the exclusive provider of earplugs to the U.S. military. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations pertaining to pre-acquisition actions or omissions of Aearo are directed as a matter of law against 3M.

14.     Based on the supposed technological design and qualities of the dual-ended Combat Arms™ earplugs, 3M/Aearo won a series of Indefinite-Quantity Contracts ("IQCs") to be the exclusive supplier of earplugs to the U.S. military between 2003 and 2012.

15.     To win these IQCs, 3M/Aearo represented that the dual-ended Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

16.     At all relevant times, 3M/Aearo's performance representations were false and 3M/Aearo knew them to be false.  Specifically, 3M/Aearo knew at the time it received the exclusive contract to supply earplugs to the U.S. military between 2003 and 2012, the dual-ended Combat Arms[TM] earplugs had a dangerous design defect that caused them to imperceptibly loosen in the wearer's ear, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug.

17.     Because the stem of the dual-ended earplug is too short, it is difficult to insert the plug deeply into some wearer's ear canals and obtain a proper fit.  Specifically, when the earplug is inserted into the ear according to standard fitting instructions, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearer's ear canals and fold back to its original shape, thereby loosening the seal in their ear canals.  Because the earplug is symmetrical, the defect exists regardless of which end is inserted into the ear.  In either scenario, the effect is that the earplug may not maintain a tight seal in some wearer's ear canals such that dangerous sounds can bypass the plug altogether thereby posing serious risk to the wearer's hearing unbeknownst to him or her.

18.     These dangerous design defects were known to 3M/Aearo in 2000 when it completed testing of the dual-ended Combat Arms[TM] earplugs.

19.     The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR").  The testing and labeling of earplugs such as the Combat Arms[TM] earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to

the Noise Contract Act, 42 U.S.C. § 4901 *et seq*.  Specifically, 40 C.F.R. § 211.206-1

provides:

> The value of sound attenuation to be used in the calculation of the Noise
> Reduction Rating must be determined according to the "Method for
> Measurement of Real-Ear Protection of Hearing Protectors and Physical
> Attenuation of Earmuffs."  This standard is approved as the American
> National Standards Institute Standard (ANSI-STD) S3.19-1974.

20.    Further, 40 C.F.R. § 211.204-4(e) requires that specific supporting

information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the
> device in a manner the insures its availability to the prospective user.  In the
> case of bulk packaging and dispensing, such supporting information must
> be affixed to the bulk container or dispenser in the same manner as the
> label, and in a readily visible location.
>
> &ast; &ast; &ast;
>
> (e) Instructions as to the proper insertion or placement of the device;

### A.    Aearo Deliberately Falsified Test Results for the Combat Arms<sup>TM</sup> Earplugs

21.    The NRR is supposed to represent the amount of sound attenuation

experienced by a test group under conditions specified by the federal Noise Control Act's

testing methodology.

22.    In addition, the U.S. military may only purchase earplugs that meet the

testing standards established by the U.S. Army Public Health Command, Army Hearing

Program, or equivalent standards that may be established by other branches of the

military.  Any such standards are tied to the NRR achieved under the EPA regulations.

23.    In or around January 2000, Aearo began NRR testing on each end of the

Combat Arms<sup>TM</sup> earplug.  Rather than use an independent test lab, Aearo performed its

testing in-house at its E-A-RCAL laboratory (also now owned by 3M).  Aearo selected 10 test subjects, including some of its own employees.  Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked end of the Combat Arms$^{TM}$ earplug inserted; and (3) the subject's hearing with the closed/blocked end of the Combat Arms$^{TM}$ earplug inserted.

24.    Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR.  This violated the ANSI S3.19-1974 testing protocol.  In fact, Aearo stopped the test of the closed/blocked end of the Combat Arms$^{TM}$ earplug inserted after only 8 of the 10 subjects had been tested.  At that point, the Combat Arms$^{TM}$ earplugs were failing expectations miserably.  Aearo was expecting to achieve an NRR of 22 with the closed/blocked end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects.  These disappointing results were caused by the design defect described above.

25.    Despite stopping the test on the closed/blocked end of the Combat Arms$^{TM}$ earplug, Aearo had the remaining two test subjects complete the test with respect to the open/unblocked end of the Combat Arms$^{TM}$ earplugs only because Aearo liked the low NRR rating the test was indicating to that point.  After completion, however, testing of the open/unblocked end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound.  Aearo thus knew the test was inaccurate and needed to be repeated.  Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

26.     After prematurely stopping the NRR test of the closed/blocked end of the Combat Arms<sup>TM</sup> earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3.

27.     Aearo also discovered that when the closed/blocked end of the Combat Arms<sup>TM</sup> earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the open/unblocked end pressed against the wearer's ear and folded backward.  When the inward pressure of the earplug was released, the flanges of the open/unblocked end tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer.  And, because the Combat Arms<sup>TM</sup> earplug was symmetrical, this same problem occurred when the earplug was reversed.

28.     Aearo manipulated the test protocol by instructing the test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

29.     Using the manipulated fitting instructions, Aearo re-tested the closed/blocked end of the Combat Arms<sup>TM</sup> earplugs starting in February of 2000.  During this re-test, test subjects folded back the flanges of the earplug on the opposite end (essentially elongating the too-short defective stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit.  Because the flanges of the opposite open/unblocked end of the earplug were folded back, the basal edge of the third flange no longer pressed against a wearer's ear canal, and thus did not cause the earplug to loosen

during the testing.  Using this manipulated test protocol, Aearo achieved a 22 NRR on the closed/blocked end of the Combat Arms™ earplug.

30.     Due to the symmetrical nature of the Combat Arms™ earplugs, the design defect that affected the fit of the closed/blocked end similarly affected the fit of the open/unblocked end.  The fact that Aearo's testing of the open/unblocked end resulted in a -2 NRR meant that the earplugs did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs.  As a result, some subjects had large standard deviations across trials on the open/unblocked end test, which suppressed the NRR rating.

31.     Nevertheless, Aearo did not re-test the open/unblocked end using the manipulated fitting instructions like it did on the closed/blocked end, i.e. folding back the flanges of the opposite end of the earplug before insertion into the ear.

32.     Aearo did not re-test the open/unblocked end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR) and further knew that the 0 NRR was a major selling point to the U.S. military.  An accurate NRR for the open/unblocked end, which would have been higher than 0, would have rendered the Combat Arms™ earplugs less attractive to the U.S. military because the military would have known that the earplugs would impair communication.

33.     Moreover, the defect in the Combat Arms™ earplugs is more likely to manifest itself during military activities than in a lab where the NRR tests are performed over the span of just a few minutes and where the head of the test subject remains

virtually motionless during the test.   Servicemen, on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

34.   Because the defect was imperceptible to the wearer, 3M/Aearo's design defect went undetected for more than a decade by the U.S. military and those who wore the Combat Arms$^{TM}$ earplugs.

**B.   3M/Aearo's False Certifications to the U.S. Military**

35.   In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms$^{TM}$ earplugs.   The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202. In its bid, Aearo certified that the Combat Arms$^{TM}$ earplugs complied with the Salient Characteristics of the MPID, even though Aearo knew that certification to be false.

36.   The pertinent Salient Characteristics of the MPID in each RFP, in relevant part, were:

> 2.1.1.  Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.
>
> 2.2.2.  The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19. …
>
> 2.4.  <u>Workmanship.</u>   The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.
>
> 2.5.  <u>Instructions.</u>   Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit. …

37.   Aearo knew that its test protocol did not comply with ANSI S3.19 but nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

38.   Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. At no time did 3M/Aearo disclose the modified fitting instructions to the U.S. military – even after winning the bid.

39.   Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." Despite Aearo knowing since 2000 that its Combat Arms$^{TM}$ earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

40.   Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the open/unblocked end of its Combat Arms$^{TM}$ earplugs had a 0 NRR, which would allow servicemen to freely communicate with their fellow servicemen and avoid any impairment to hear enemy combatants.

41.   Aearo also falsely certified that the closed/blocked end of its Combat Arms$^{TM}$ earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. Nothing in the fitting instructions provided by 3M/Aearo to end users disclosed that it was

necessary to fold back the flanges of the opposite end of the earplug to ensure a proper fit and achieve the promised NRR.  By failing to provide this disclosure, 3M/Aearo falsely overstated the amount of hearing protection afforded by the closed/blocked end of the earplug and falsely overstated the benefits of the open/unblocked end of the earplug.

42.    Based on Aearo's false representations, its bid was the prevailing bid and Aearo entered into the first of a series of IQCs, making it the exclusive provider of selective attenuation earplugs to the U.S. military.

43.    In subsequent years in response to additional RFPs, 3M/Aearo re-certified that the Combat Arms™ earplugs met the MPID criteria, even though 3M/Aearo knew that to be false.

44.    In total, the U.S. military purchased enough Combat Arms™ earplugs to provide one pair to every servicemember deployed each year in major foreign engagements from 2003 through 2015.

45.    3M continued to sell the Combat Arms™ earplugs to the U.S. military until late 2015, at which time 3M discontinued the earplug.

46.    3M's misrepresentations about the benefits and protections provided by the Combat Arms™ earplugs caused Plaintiff to suffer hearing loss and tinnitus.

47.    At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without disclosing the defect or the modified fitting instructions.

**ALLEGATIONS REGARDING TOLLING OF STATUTES OF LIMITATIONS**

48.     Under the Servicemembers Civil Relief Act, the period of Plaintiff's military service may not be included in computing any statute of limitations applicable herein. *See* 50 U.S.C. § 3936.

49.     Plaintiff could not, by the exercise of reasonable diligence, have discovered 3M's wrongful acts as the cause of his injuries at an earlier time, because, at the time of his injuries, the cause was unknown to Plaintiff.   Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of his injuries, or the tortious nature of the conduct causing his injuries, until less than the applicable limitations period prior to the filing of this action.

50.     Further, the running of the statute of limitations has been tolled by reason of 3M's fraudulent concealment.   Through its affirmative misrepresentations and omissions, 3M actively concealed from Plaintiff the risks associated with the defects in the Combat Arms$^{TM}$ earplugs.

51.     As a result of 3M's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed to the defects and risks alleged herein, and that those defects and risks were the direct and proximate result of 3M's acts and omissions.

52.     Through 3M's affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms$^{TM}$ earplugs, Plaintiff was prevented from discovering this information sooner because 3M misrepresented and continued to misrepresent the defective nature of the Combat Arms$^{TM}$ earplugs.

## CAUSES OF ACTION

**COUNT I**
*Strict Products Liability – Design Defect*

53.     Plaintiff re-alleges and incorporates by reference each and every allegation of fact set forth above as if fully contained herein.

54.     3M is the manufacturer and seller of the defective Combat Arms™ earplugs.

55.     The defective Combat Arms™ earplugs that 3M manufactured, distributed, and sold were, at the time they left 3M's control, defectively designed in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

56.     The defective Combat Arms™ earplugs that 3M manufactured, distributed, and sold were, at the time they left 3M's control, defective and unreasonably dangerous for their ordinary and expected use because they did not guard against the damaging loud noises attendant to military use that can cause hearing loss and/or tinnitus.

57.     The defective Combat Arms™ earplugs that 3M manufactured, distributed, and sold were, at the time they left 3M's control, defective and not reasonably safe for the product's intended use.

58.     3M knew of the defect in the Combat Arms™ earplugs prior to becoming the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012.

59.     No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that 3M had, namely that the stem of the earplug was too

short to fit correctly in many people's ears and that if not fitted correctly the earplugs would not guard against loud impulse noises and could cause hearing loss and tinnitus.

60.    The defective Combat Arms$^{TM}$ earplugs that 3M manufactured, distributed, and sold were delivered to Plaintiff without any change in their defective condition and were used by Plaintiff in the manner expected and intended.

61.    3M owed a duty of care to Plaintiff to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by servicemen to protect them from damaging noises typically incurred in military service.

62.    3M owed a duty of care to Plaintiff to design and sell earplugs that were fit for use in military service and that performed according to the specifications that 3M certified the Combat Arms$^{TM}$ earplugs met.

63.    3M owed a duty of care to Plaintiff to design and sell earplugs that were safe when used for their intended purpose, i.e., to provide hearing protection in the presence of loud impulse sounds.

64.    3M breached these duties by designing and selling the Combat Arms$^{TM}$ earplugs despite its knowledge that the product was defective, in that the stem of the earplug was too short to obtain a proper fit in many people's ears and the design of the earplug caused it to loosen imperceptibly in the wearer's ear which allowed damaging sounds to enter the ear canal, thereby resulting in failure to guard against loud impulse noises.

65.    Plaintiff suffered injury and damage as a direct and proximate result of the defective and unreasonably dangerous and unsafe condition of the Combat Arms<sup>TM</sup> earplugs that 3M designed, manufactured, distributed, and sold.

**COUNT II**
*Strict Products Liability – Marketing Defect/Failure to Warn*

66.    Plaintiff re-alleges and incorporates by reference each and every allegation of fact set forth above as if fully contained herein.

67.    3M is the manufacturer and seller of the defective Combat Arms<sup>TM</sup> earplugs.

68.    The defective Combat Arms<sup>TM</sup> earplugs that 3M manufactured, distributed, and sold were, at the time they left 3M's control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

69.    The defective Combat Arms<sup>TM</sup> earplugs that 3M manufactured, distributed, and sold were, at the time they left 3M's control, defective because 3M failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

70.    3M had a duty to manufacture, design, and sell the Combat Arms<sup>TM</sup> earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff.

71.    3M had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms<sup>TM</sup> earplugs when worn in the ordinary course.

72.     3M breached these duties by failing to provide adequate warnings, instructions, or labels regarding proper fitting instructions and/or the risks of hearing loss and damage to the ear that exists with an improper fit.

73.     It was foreseeable to 3M that the Combat Arms™ earplugs would be unreasonably dangerous if distributed without the warnings regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

74.     Not only was it foreseeable, it was in fact foreseen by 3M/Aearo.  During testing, 3M/Aearo discovered that because the stem of the Combat Arms™ earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

75.     3M/Aearo also discovered that when the closed/blocked end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the open/unblocked end pressed against the wearer's ear and folded backward.   When the inward pressure of the earplug was released, the open/unblocked flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer.   And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

76.     3M had a post-sale duty to warn of the above alleged product-related defects and risks because 3M knew or reasonably should have known that the Combat Arms™ earplug posed a substantial risk of harm to servicemen, including Plaintiff; the servicemen who used the Combat Arms™ earplugs can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects because said defects

were imperceptible; a warning or instruction showing how to correctly and safely use the Combat Arms™ earplugs could have been effectively communicated to and acted upon by the servicemen to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in servicemen, is sufficiently great to justify the slight burden of providing a warning or instruction.  3M breached this duty by failing to provide a post-sale warning or instruction.

77.     The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing, unbeknownst to Plaintiff.

78.     The warnings and instructions that accompanied the Combat Arms™ earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to 3M.

79.     Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ earplugs in the manner contemplated by 3M, he would not have used them.

80.     Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by 3M/Aearo during testing, which were not disclosed to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

81.     Plaintiff suffered injury and damage as a direct and proximate result of the use-defectiveness and  3M's  failures  to  warn  and/or  provide  adequate  instructions

regarding the dangerous condition of the Combat Arms™ earplugs that 3M manufactured, distributed, and sold.

## COUNT III
*Negligence*

82.     Plaintiff re-alleges and incorporates by reference each and every allegation of fact set forth above as if fully contained herein.

83.     3M had a duty to use its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in 3M's business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

84.     3M further had a duty to comply with the certifications made to the U.S. government about the qualities and performance characteristics of the Combat Arms™ earplugs.  Plaintiff is among the class of persons that these regulations and certification standards are designed to protect and he was a foreseeable plaintiff to 3M.

85.     3M breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

86.     The damages suffered by Plaintiff was or should have been reasonably foreseeable to 3M.

87.     Plaintiff was damaged by 3M's conduct, including but not limited to, damage to his hearing.

88.    3M's breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiff.

## COUNT IV
### *Punitive Damages*

89.    Plaintiff re-alleges and incorporates by reference each and every allegation of fact set forth above as if fully contained herein.

90.    3M's conduct in designing, manufacturing, marketing, selling, and distributing the Combat Arms$^{TM}$ earplugs, and in failure to warn of known dangers, in light of knowledge possessed by 3M, was reckless, willful, wanton and likely to lead to physical injury.

91.    3M knew of the Combat Arms$^{TM}$ earplugs' defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, and sell the Combat Arms$^{TM}$ earplugs so as to maximize sales and profits at the expense of the health and safety of servicemen, including Plaintiff, in conscious and/or willful and wanton disregard of the foreseeable harm.

92.    As a direct and proximate result of the willful, wanton, and/or intentional acts and/or omissions of 3M, Plaintiff suffered damages, as alleged herein, and as such, Plaintiff prays that punitive damages be awarded against 3M.

## DAMAGES

93.    Plaintiff re-alleges and incorporates by reference each and every allegation of fact set forth above as if fully contained herein.

94.     As a direct and proximate result of the defects existing in the Combat Arms$^{TM}$ earplugs designed, manufactured, distributed, sold, and/or placed into the stream of commerce by 3M, and as a direct and proximate cause of 3M's breaches of duties described herein, Plaintiff has been injured, thereby giving rise to damages, including but not limited to, past and future medical bills, loss of income and future earning capacity, permanent impairment, disfigurement, past and future physical pain and suffering, and past and future mental anguish and emotional distress.

95.     3M's acts, omissions, and breaches, as set forth herein, were the proximate cause of Plaintiff's injuries, giving rise to Plaintiff's claims stated herein, and entitling Plaintiff to all economic and non-economic damages available under law, including but not limited to, past and future medical expenses, past and future pain and suffering, lost wages, punitive damages, and all other damages.

96.     As a direct and proximate result of 3M's above-stated actions and/or omissions, Plaintiff prays for judgment against 3M in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs and interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

(A)     That summons and process issue and be served upon Defendant;

(B)     For a trial by a jury comprised of twelve (12) persons;

(C)     That Plaintiff be awarded an appropriate sum to compensate him for his damages, both special and general;

(D)   That punitive damages be imposed against Defendant and awarded to Plaintiff;

(E)   For all costs of Court; and

(F)   For such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.


Respectfully submitted this 1st day of August, 2019.

**KARSMAN, McKENZIE & HART**


_/s/ Jeremy S. McKenzie_____
Jeremy S. McKenzie
Georgia Bar No. 436655
C. Dorian Britt
Georgia Bar No. 083259

21 West Park Avenue
Savannah, Georgia 31401
(912) 335-4977 Telephone
(912) 388-2503 Facsimile


**HAFEMANN, MAGEE & THOMAS**


_/s/ John D. Hafemann_____
John D. Hafemann
Georgia Bar No. 327982
john@fed-lit.com

21 West Park Avenue
Savannah, GA 31401
(843) 441-3356